OPINION OF THE COURT
NYGAARD, Circuit Judge.
The issue before us on appeal is, as it was before the District Court, simply a matter of contract interpretation. Appellant, Arcadia Petroleum Ltd., is seeking to recover demurrage[1] resulting from two Charter Party Agreements between Arcadia and Appellee, Sun International Ltd., involving the carriage of crude oil. It is undisputed that, at one time, Sun agreed that it owed Arcadia in excess of $600,000 in demurrage. It is also undisputed that Sun has paid Arcadia nothing. The issue is whether, when Sun and Arcadia resolved the disputed amount of the demurrage claim, they created separately enforceable contracts, subject to Pennsylvania’s four-year statute of limitations, or whether the resolution of this dispute is covered by the Charter Party Agreements’ dispute resolution clause and its one-year limitation of actions.
The District Court concluded that Arcadia’s claims against Sun were barred by the one-year limitation in the original Charter Party Agreements, and entered summary judgment in favor of Sun. We will affirm.
I.
The facts are not disputed. Arcadia, an oil trader, entered into two separate Char *166 ter Party Agreements[2] with Sun, one in 1999 and the other in 2000, concerning the carriage of crude oil. Arcadia was the owner of the vessel, MTV MADELAINE, and Sun was the charterer. The Charter Party Agreements were fairly standardized contracts on a form called the “Asbantankvoy” with several specific clauses added and agreed to by Arcadia and Sun.
The first contractual clause germane to the issue is the Demurrage Clause. It specifies how any damages Arcadia may suffer because of Sun’s delay in completing the voyage or off-loading the cargo would be calculated.[3]
The second is the Dispute Resolution Clause. It specifies that any dispute relating to the Charter Party Agreements would either be litigated in the U.S. District Court for the Eastern District of Pennsylvania or subject to arbitration in New York City. The party that initiated the proceedings could choose the forum in which to bring its cause of action.
The third clause, and the one that resolves the issue, is the Claims Clause, which is contained in each Charter Party Agreement. The Claims Clause sets forth the procedure for submitting demurrage claims. It also includes the contractual time bar under which a party who fails to demand arbitration or file suit to resolve a disputed claim within one year is deemed to have waived the claim or unresolved dispute. Specifically it provides:
Owners and Charterers further agree that with respect to any claim or other unresolved dispute arising out of this Charter, unless arbitration or litigation, as per this Charter, is commenced within one year after the completion of discharge or the date when discharge would have been completed, such claim or other dispute is waived and all liability with respect thereto is discharged. (Emphasis added.)
The 1999 Charter Party Agreement called for the carriage of crude oil aboard Arcadia’s ship, the MTV MADELAINE from Nigeria, which was to be discharged at Sun’s refinery port in Philadelphia. The ship departed Escravos, Nigeria, on January 9, 2000, arrived at port on January 25, 2000, and discharge was completed on February 5, 2000. On February 10, 2000, Arcadia notified Sun of the demur-rage incurred and sent the appropriate documentation. The demurrage resulted from Sun’s delay of 11 days, 10 hours and 10 minutes calculated at a rate of $27,000 per day.
The 2000 Charter Party Agreement called for the carriage of crude oil again from Nigeria to Sun’s refinery in Philadelphia. The MTV MADELAINE departed Escravos, Nigeria, on February 27, 2000, arrived at port on March 17, 2000 and completed discharge on March 29, 2000. On April 5, 2000, Arcadia notified Sun of its demurrage supplemented by the appropriate documentation. The demurrage resulted from Sun’s delay of 11 days, 9 hours *167 and 49 minutes calculated at a rate of $27,000 per day.
Sun disputed the amount that Arcadia claimed was due, and negotiations on the amount of demurrage followed. The dispute was resolved. Arcadia agreed to accept $300,943.43 for the 1999 Charter Party Agreement and $299,582.80 for the 2000 Charter Party Agreement, for a total demurrage of $600,525.23.
On October 27, 2000, within two days of the conclusion of negotiations on the 2000 Charter Party Agreement, Sun sent its own demurrage and cargo claims to Arcadia stemming from voyages on the M/V SERENA and the M/V KISHORE. Sun claimed that $625,287.75 in demurrage was due from Arcadia. Sun’s position was that inasmuch as demurrage set-offs are customary in the vessel charter industry, and because it was owed approximately the same amount that it owed to Arcadia, any demurrage due to Arcadia was completely set-off. Hence, Sun declared that it would pay Arcadia nothing on the demurrage charge arising from the Charter Party Agreement at issue here. Arcadia objected to the set-off because Sun’s demurrage claim arose from separate crude oil purchase agreements between the parties, not from the 1999 and 2000 Charter Party Agreements. Nonetheless, it neither demanded arbitration nor filed suit at that time.
II.
It was not until February 2004, that Arcadia filed suit in the U.S. District Court for the Eastern District of Pennsylvania. Attempting to salvage its claim from the contractual time-bar, Arcadia contended that the demurrage negotiations between the parties concerning the voyages on the M/V MADELAINE resulted in separate settlement agreements governed by Pennsylvania’s general four-year statute of limitations for contract claims. Arcadia averred that Sun breached these settlement agreements.
Sun responded that the negotiations were simply the exchange of accountings of demurrage done in the normal course of business, and, that Arcadia’s claims were barred by the one-year limitations period set forth in the original Charter Party Agreements. The parties filed cross motions for summary judgment.
The District Court opined that the parties did not enter into binding settlement agreements because neither party made mutual concessions nor was there any consideration to support the formation of new agreements. See District Ct. Op. at 10. The District Court determined that Arcadia’s claims stemmed from the two original Charter Party Agreements, and that Arcadia waived its rights to seek demurrage from Sun because it failed to bring suit within the one-year limitation period set forth in the Charter Party Agreements. The District Court then granted summary judgment in favor of Sun.
III.
It is unquestioned that Sun breached its contracts with Arcadia. Sun admits that it entered the 1999 and 2000 Charter Party Agreements with Arcadia under which demurrage would be paid for any delays. It is undisputed that delays occurred, demur-rage incurred, and that the parties negotiated the amounts due. Moreover, Sun admits that it has paid nothing to Arcadia to satisfy Arcadia’s demurrage claims.
Nonetheless, Arcadia has waived its right to collect any amount that was due. The language of the Charter Party Agreements is clear and unambiguous. Arcadia’s demurrage claims cannot be excised from the Charter Party Agreements and transmuted into separate agreements sub *168 ject to Pennsylvania’s statute of limitations. The contracts breached were not new settlement agreements resulting from the parties’ negotiations, but rather the 1999 and 2000 Charter Party Agreements. We conclude that Arcadia’s demurrage claims originated under them and any dispute arising therefrom is governed by the Charter Party Agreements’ dispute resolution clause.
The negotiations were simply exchanges of demurrage calculations. The record shows clearly that this is usual and customary in the vessel charter industry following the discharge of the cargo.[4] It is also counterintuitive to believe that with hundreds of thousands of dollars at stake, with demurrage being figured to the minute, the parties would not engage in some substantial quibbling over the amount claimed. Indeed, if all disputes over demurrage created new contracts divorced from the Charter Parties, the Demurrage, Dispute Resolution and Claims Clauses contained the Charter Party agreements would be nullified. The record reflects that the parties simply used a method intuitively expected and common in the trade to agree upon the demurrage. Moreover, Arcadia was put on notice almost immediately after they negotiated the demurrage that Sun had no intention of paying it.
Sun’s declaration that it did not intend to pay Arcadia any amount of demurrage was notice to Arcadia of an anticipatory breach of Sun’s payment obligations under the Charter Party Agreement. That breach of the Charter Party Agreements, constituted an unresolved dispute or claim which necessitated action by Arcadia under the claims clauses set forth in the 1999 and 2000 Charter Party Agreements. Well within the one-year limitation of actions period, Arcadia knew that Sun was not going to pay what it owed under the 1999 and 2000 Charter Party Agreements. However, instead of demanding arbitration or filing suit to resolve this dispute within the one-year limitations period set forth in the Charter Party Agreements, Arcadia chose to take no action for nearly four years.
Because those Charter Party Agreements govern this dispute, and because both contained a one-year limitations period for resolving any claim arising under them, any demurrage claims that Arcadia had against Sun have been waived by the passage of time. Arcadia was bound to either demand arbitration or file suit against Sun on the demurrage claims within one year. Because it did neither, the claims are time-barred.[5]
The judgment of the District Court will be affirmed.

. Demurrage is the parties’ agreed upon amount of damages to be paid for a ship’s delay caused by a default of the charterers at either the beginning or end of a ship’s journey. John Schofield, Laytime and Demurrage § 6.3, at 317 (4th ed.2000) (quoting Harris v. Jacobs, 15 Q.B.D. 247, 251 (1885)).

. A "Charter Party Agreement” is a document entered into when the charterer takes over the use of a ship belonging to the owner. This document sets forth the arrangements and contractual engagements between these parties. Grant Gilmore and Charles L. Black, Jr., The Law of Admiralty § 4. 1, at 193 (2d ed.1975).

. The relevant language states:
Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere hererin provided exceeds the allowed laytime elsewhere herein specified.
The Demurrage Clause also included specific provisions, not relevant here, if the delay resulted from a condition beyond Sun's control, such as fire, storm, explosion, strike, stoppage or restraint of labor.

. For example, in support of its summary judgment motion, Sun submitted the affidavit of Thomas Lamm, Marine Coordinator for Sun from 1995-2001, who stated that it was usual and customary with respect to vessel charters for the parties to engage in an accounting for demurrage following the discharge of cargo. See Lamm Aff. at H 6. (A162a.) In response, Arcadia submitted the affidavit of Mark Reed, an Advisor to the Energy Department for Mitsui & Co. UK PLC (a 20% shareholder in Arcadia), who did not dispute that such an accounting was usual and customary. See Reed Unswn. Dec. Pursuant to 28 U.S.C. § 1746 at H111-12. (A60a62a.) Furthermore, in its Complaint, Arcadia stated that the exchanges of parties' demur-rage calculations after the discharge of cargo is “usual and customary at the completion of charters.” Pi’s Compl. at It 6. (A6a.)

. Because we hold that no separate settlement agreements were ever formed, we need not discuss the District Court's denial of Arcadia’s equitable grounds for relief or Arcadia's evidentiary challenges.